1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  DILLON S. SUITT,                    No. CIV S-09-1847-CMK

12              Plaintiff,

13       vs.                            MEMORANDUM OPINION AND ORDER

14  COMMISSIONER OF SOCIAL
    SECURITY,
15
                Defendant.
16
    _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21  judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending

22  before the court are plaintiff's motion for summary judgment (Doc. 18) and defendant's cross-

23  motion for summary judgment (Doc. 19).

24  / / /

25  / / /

26  / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on January 9, 2004.[1]  In the application, plaintiff claims that disability began on January 1, 1999.  Plaintiff claims that disability is caused by a combination of "depression, personality disorder, and suicide attempts."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing.  The notice of hearing was sent on September 28, 2005.  Plaintiff did not appear at the hearing and a notice to show cause was issued on October 31, 2005.  After plaintiff failed to respond, plaintiff's case was dismissed by order issued on January 3, 2006.  On July 27, 2007, the Appeals Council set aside the dismissal.[2]  A new hearing was held on March 13, 2008, before Administrative Law Judge ("ALJ") Brenton L. Rogozen.   In a March 24, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.  The medical evidence establishes that the claimant that the "severe" impairments of a mood disorder, not otherwise specified, a personality disorder, not otherwise specified, and a history of polysubstance abuse and alcohol dependence/abuse in reportedly nearly-complete sustained remission since October 30, 2007;

2.  The severity of the claimant's impairments, in combination, has medically equaled the requirements of Sections 12.04 and 12.06 of the regulations since October 30, 2007, and they are expected to preclude him from working for at least 12 continuous months:

---

[1]     The ALJ's most recent hearing decision reflects the following relevant procedural history:

The record informs that the claimant had filed prior concurrent applications for Social Security disability benefits . . . which were denied initially . . . then at the reconsideration level. . . .  Even though the claimant currently contends the same disability onset date as before, the undersigned finds no evidence that the Administration erred in any way in reaching those denials.  Further, the determinations were not reviewed at that time.  Therefore, the undersigned finds no "good cause" to reopen the prior determinations, and they shall remain in force pursuant to res judicata. . . .

[2]     The Appeals Council concluded that plaintiff's on-and-off-again homelessness and incarceration "lends some credibility that he may not have received the hearing notices."

3. The claimant's history of polysubstance and alcohol dependence/abuse is not a factor material to the findings of "disability" as of the determined onset date of October 30, 2007, but was prior to that date; because the record includes no documented period of sustained sobriety for the claimant prior to October 30, 2007, there is no contraindication to the undersigned's finding that independent of his polysubstance and alcohol dependence and abuse disorders, he would have been able to perform at least simple repetitive tasks; based then on his age, education, and vocational experience, a findings of "not disabled" would be reached for all periods prior to October 30, 2007, as directed by SSR 85-15P, 20 C.F.R. 426.935(b) and Section 1614(a)(3) of the Social Security Act; and

4. The claimant has been under a "disability" since October 30, 2007, but not before that date, making him not entitled to Disability Insurance Benefits, but eligible at least on medical grounds to receive Supplemental Security Income payments beginning on that date.

After the Appeals Council declined review on April 30, 2009, this appeal followed.

## II. SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

April 21, 1997 – Plaintiff voluntarily reported to the hospital complaining of depression and increasing suicidal ideation. Plaintiff was diagnosed with major depression, marijuana abuse, methamphetamine abuse, and alcohol abuse.

July 2, 1997 – Plaintiff was admitted to the hospital as a danger to self. Plaintiff arrived at the hospital smelling of alcohol and obviously intoxicated. The treating doctor noted: "The patient's drug behavior dates back at least one decade and has been unremitting."

April 28, 1998 – Plaintiff was admitted to the hospital as a danger to self. His toxicology screen was positive for illegal drugs though he denied recent use. On discharge, plaintiff refused any follow-up treatment.

November 4, 1999 – Pavitar Cheema, M.D., performed a comprehensive psychiatric evaluation. At that time, plaintiff complained of bipolar disorder. He also told the doctor that he had been sober for the past 11 months.

1    <u>November 25, 2002</u> – Plaintiff was admitted to Sequoia Hospital as a danger to

2    self.  On discharge, the doctor stated:

3           He was initially noted to be somewhat dysphoric but over the next few
            days he seemed very pleasant and interacted appropriately with staff and
4           peers.  He was very focused on wanting to return home.  He reported that
            he does have a job to go to.  He works as a carpenter and had temporary
5           housing with his boss.  He was agreeable to follow up at mental health
            clinic upon discharge from the hospital.  He was more stable in his mood
6           and affect.  With continued structured support and milieu therapy, he
            showed significant improvement and was discharged. . . .

7

8    The doctor diagnosed bipolar affective disorder in remission and amphetamine dependence.

9           <u>December 13, 2002</u> – Plaintiff was admitted to San Mateo County Health as a

10   danger to self.  Plaintiff's blood tested positive for methamphetamine and marijuana.  Plaintiff

11   was diagnosed with amphetamine abuse, marijuana abuse, alcohol abuse, and "rule out mood

12   disorder NOS."  The doctor's instruction on discharge was: "The patient to stop substance use."

13          <u>December 28, 2002</u> – Plaintiff was hospitalized after being brought in by police as

14   a danger to self.  The chart notes reflect that, while plaintiff was diagnosed two years prior with a

15   bipolar disorder, it was unclear if plaintiff was clean and sober at the time of the diagnosis.  The

16   treating physician gave plaintiff a discharge diagnosis of amphetamine abuse, marijuana abuse,

17   alcohol abuse, and a personality disorder, NOS.  Plaintiff's toxicology screen was negative for

18   drugs.

19          <u>December 31, 2002</u> – Plaintiff was discharged from the hospital following his

20   having self-reported with a complaint of "My emotions and feelings, they're all mixed up and

21   confusing."  The doctor noted a long history of substance abuse which plaintiff stated he did not

22   see as a problem.  Plaintiff stated: "I need it with the lifestyle that I live, since I have no place to

23   live."  On discharge, plaintiff was diagnosed with amphetamine abuse, marijuana abuse, alcohol

24   abuse, and a mood disorder, NOS.

25   / / /

26   / / /

1           <u>January 5, 2003</u> – A form entitled "Assessment of Suicide or Self-Harm" prepared

2 by staff at San Mateo County Health indicates that the only risk factor for suicide or self-harm is

3 substance abuse.

4           <u>February 4, 2003</u> – A "Physical Nursing Assessment" form prepared at San Mateo

5 County Health indicates that plaintiff admitted methamphetamine use one and one-half days

6 prior.

7           <u>January 6, 2003</u> – Plaintiff was admitted to San Mateo County Health following a

8 suicide attempt.  Plaintiff's blood tested positive for methamphetamine and marijuana.  On

9 discharge, plaintiff was diagnosed with amphetamine abuse, marijuana abuse, alcohol abuse, and

10 mood disorder, NOS.

11           <u>June 7, 2003</u> – Plaintiff completed a daily activities questionnaire.  Plaintiff stated

12 that, at the time, he was living in a mental hospital.  Plaintiff stated that he has no difficulties

13 with providing for himself except lack of funds.  Similarly, he says he does no shopping due to

14 lack of funds.  He added that he does his own laundry, cleans his room, and requires no

15 assistance with personal care.  He stated that he enjoys gardening and art.  Plaintiff stated that he

16 remembers what he sees on television, reads on a daily basis, and can remember what he reads.

17 He did state that he has trouble concentrating and often becomes sidetracked.

18           <u>September 9, 2003</u> – A form entitled "Assessment of Suicide or Self-Harm"

19 prepared by staff at San Mateo County Health indicates that the only risk factor for suicide or

20 self-harm is substance abuse.  Another form, entitled Physical Nursing Assessment," indicates

21 that plaintiff used methamphetamine two days prior and was not taking any prescription

22 medications.

23           <u>September 25, 2003</u> – Admission assessment notes from San Mateo County

24 Health indicates that plaintiff last used methamphetamine 4 days prior.

25 / / /

26 / / /

October 7, 2003 – A form entitled "Assessment of Suicide or Self-Harm" prepared by staff at San Mateo County Health indicates that the only risk factor for suicide or self-harm is substance abuse.

October 8, 2003 – Discharge notes from San Mateo County Health indicate that plaintiff's blood had tested positive for methamphetamine.  The notes also indicate that plaintiff was not currently taking any psychiatric medications.

October 20, 2003 – Discharge notes from San Mateo County Health Center reflect that plaintiff was hospitalized after a suicide attempt.  The notes indicate that plaintiff has a significant history of substance and alcohol abuse and that plaintiff admitted methamphetamine use four to five days before being admitted.

October 28, 2003 – Plaintiff was hospitalized again following a suicide attempt. At the time, plaintiff was not taking any medications.  The doctor noted a history of drug and alcohol abuse.

November 24, 2003 – Nia T. Lozano, M.D., prepared a psychiatric discharge report following plaintiff's hospitalization incident to a suicide attempt.  The doctor noted plaintiff's chief complaint as ". . . history of polysubstance abuse, mood disorder, and unclear personality disorder. . . ."  Dr. Lozano noted that, at the time, plaintiff was not taking any medications.  On discharge, the doctor provided the following assessment:

> This is an appropriately groomed well-nourished male who is sitting calmly in the day room.  He smiles on approach.  He is pleasant and exhibits good eye contact.  His speech is of normal rate and rhythm.  His mood is "fine."  His affect is appropriate.  His thoughts are linear.  He denies suicidal ideation, homicidal ideation, and ACH.  His insight and judgment are both fair.

Dr. Lozano diagnosed mood disorder, NOS, and polysubstance abuse in "early partial remission."

February 1, 2004 – Plaintiff was taken to the hospital following complaints of chest pain.  On admission, plaintiff denied any illegal drug use.

1         August 16, 2004 – Agency consultative doctor Danilo Lucila, M.D., completed a

2    mental residual functional capacity assessment.  The doctor opined that plaintiff is moderately

3    limited in the ability to understand, remember, and carry out detailed instructions.  In all other

4    areas, no limitations were noted.

5         October 4, 2006 – Plaintiff self-reported to the hospital, having walked through

6    the night to get there, complaining of grief and depression over the recent death of his mother.

7    Plaintiff was diagnosed at that time with methamphetamine abuse and drug-inducted psychotic

8    and mood disorders.  The doctor stated that plaintiff does not have a "pure" psychiatric illness,

9    but opined that plaintiff's problems likely stem from drug and alcohol abuse.  The chart notes

10   also reveal that plaintiff "recently" lost his job in construction due to methamphetamine use.

11        October 27, 2006 – The CAR indicates that plaintiff presented to the hospital with

12   "some feeling of chills and malaise."  Toxicology notes reveal that plaintiff's blood tested

13   positive for illegal drugs.  Plaintiff was diagnosed with alcohol dependence, methamphetamine

14   dependence, substance abuse, and substance-inducted psychotic disorder.

15        October 14, 2007 – Plaintiff was admitted to the hospital as a danger to self.

16   Hospital admission notes indicate that plaintiff's blood tested positive for methamphetamine and

17   marijuana.

18        January 30, 2008 – Plaintiff was examined by agency examining doctor Ubaldo

19   Sanchez submitted a report following a comprehensive psychological evaluation.  Plaintiff

20   reported that he last worked two to three years ago in construction.  Plaintiff also reported that he

21   had been clean and sober for "over three months."  On mental status examination, Dr. Ubaldo

22   noted that plaintiff "did not have any difficulties understanding instructions and repetition and

23   emphasis were not needed."  The doctor diagnosed bipolar disorder, polysubstance abuse, and

24   / / /

25   / / /

26   / / /

indicated a need to rule out mood disorder, NOS.  The doctor offered the following functional

assessment:

> Mr. Suitt is not limited to daily activities such as dressing, bathing, and
> eating.
>
> He would have some difficulties being socially appropriate given his mood
> swings.
>
> He needs to continue his medication and ongoing mental health treatment.
>
> He is able to perform mildly to moderately complex tasks.  He is currently
> unable to tolerate the stressors encountered in a normal working
> environment.  He appears emotionally volatile, has a history of numerous
> suicide attempts, and has difficulty modulating his emotions.

> <u>March 13, 2008</u> – Medical expert Dr. Dusay testified at the administrative

hearing.

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is:

(1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

whole.  <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

more than a mere scintilla, but less than a preponderance.  <u>See</u> <u>Saelee v. Chater</u>, 94 F.3d 520, 521

(9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971).  The record as a whole,

including both the evidence that supports and detracts from the Commissioner's conclusion, must

be considered and weighed.  <u>See</u> <u>Howard v. Heckler</u>, 782 F.2d 1484, 1487 (9th Cir. 1986); <u>Jones</u>

<u>v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

decision simply by isolating a specific quantum of supporting evidence.  <u>See</u> <u>Hammock v.</u>

<u>Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

findings, or if there is conflicting evidence supporting a particular finding, the finding of the

Commissioner is conclusive.  <u>See</u> <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

1    Therefore, where the evidence is susceptible to more than one rational interpretation, one of
2    which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.
3    Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal
4    standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th
5    Cir. 1988).

6

7                              **IV.  DISCUSSION**

8              In his motion for summary judgment, plaintiff argues the ALJ erred as a matter of
9    law when he concluded that drug and alcohol abuse were a contributing factor material to
10   disability prior to October 30, 2007.  Plaintiff also argues that the ALJ's finding with respect to
11   drugs and alcohol abuse is not supported by substantial evidence.  Plaintiff seeks a remand for
12   the direct award of benefits.

13             If drug or alcohol use is a contributing factor material to a determination of
14   disability, an individual is not entitled to benefits.  See 20 C.F.R. §§ 404.1535 and 416.945; see
15   also Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir. 1998).  The burden is on the plaintiff to
16   demonstrate that drug and alcohol addiction is not a material factor by showing that an
17   impairment would have been disabling even if drug and alcohol use ceased.  See Parra v. Astrue,
18   481 F.3d 742, 748 (9th Cir. 2007).  To do so, the plaintiff would have to demonstrate that the
19   impairment ". . . would remain during periods when she stopped using drugs and alcohol."  See
20   Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001) (citing Sousa, 143 F.3d at 1245).

21             With respect to drugs and alcohol, the ALJ stated:
22             The claimant acknowledges that he has had a long history of
              polysubstance and alcohol abuse, and that in 1998-1999 he served jail time
23            for domestic violence.  The claimant was also diagnosed in 1999 with a
              bipolar disorder (Exh. 11-F).  As discussed above, his prior claims were
24            denied at the reconsideration level on January 31, 2000, and there was no
              further review granted at that time.  The undersigned finds no significant
25            medical evidence from the years 2000-2001.  The current record informs
              that on January 5, 2002, he received the diagnoses of amphetamine abuse
26            and dependence but only "rule-out" secondary to mood and personality

                                          9

disorders (Exh. 4-F, p. 97).  The claimant received a July 24, 2002 '5150' psychiatric hold secondary to an intentional overdose on sleeping pills. On November 25, 2002, repeat '5150,' the claimant was described as an individual with an "extensive" history of bipolar affective disorder complicated by polysubstance dependence.  The claimant reported that he would be willing to attend A on this date (Exh. 3-F, pp. 20-21).  However, his December 13-18, 2002 '5150' was characterized by findings of ongoing amphetamine abuse, marijuana abuse, and alcohol abuse, and again, only rule-out mood disorder.  (Exh. 4-F, p. 29).   The claimant was encouraged by clinicians to stop abusing substances (Exh. 3-F, pp. 13-15). The claimant apparently initially listened to this advice, but admitted on December 31, 2002, that he "went back to using methamphetamine, marijuana, and alcohol" as he "does not see it as a problem" stating, "I need it with the lifestyle that I have. . . .  I could stop tomorrow."  (Exh. 3-F, p. 10).

The claimant's Axis I impressions on January 6, 2003, were only amphetamine abuse and marijuana abuse (Exh. 3-F, p. 17), although by January 21, 2003, psychiatric evaluation these included amphetamine abuse, marijuana abuse, alcohol abuse, and mood disorder, not otherwise specified, but also provisionally rule-out drug-induced mood disorder (Exh. 4-F, p. 103).  September 9, 2003's '5150' found at Axis I only "methamphetamine abuse" and provisionally "rule-out borderline personality disorder" when the claimant admitted that he used methamphetamine "as often as he can" and added, "they won't even accept me in mental health (due to) history of non-compliance" (Exh. 4-F, pp. 65, 68 & 80).  On October 7, 2003, the sole Axis I impression was "methamphetamine abuse" (Exh. 4-F, p. 68).  Although his polysubstance dependence was said to be "in early partial remission" on October 9, 2003, evaluation (Exh. 3-F, p. 4), the claimant returned to the emergency room on October 28, 2003, following an intentional overdose (Exh. 4-F, p. 29). On November 24, 2003, the claimant was restarted on psychotropic medications, and received the diagnoses of "mood disorder, not otherwise specified, polysubstance abuse in early partial remission" (Exh. 3-F, pp. 1-2).

On February 1, 2004, the claimant was brought in by ambulance to the hospital from an inpatient psychiatric facility he was living, to evaluate for chest pain.  However, on testing, all examination and vital signs were normal (Exh. 4-F, pp. 50-52).  On February 25, 2004, the claimant's "primary diagnosis" was identified as "amphetamine dependence disorder" but he was reportedly trying to stop using (Exh. 7-F, p. 21).  Circa September 2004, the claimant was described by clinicians as "doing better" having broken up with his girlfriend who was a drug abuser, and remaining "clean and sober" (Exh. 7-F, pp. 8-9).  As of November 2004, the claimant promised that he was not taking methamphetamine and overall appeared to be taking medications as prescribed.  The claimant's treating clinician observed that at this time he was able to interact better, and displayed better focus while abstaining from substances (Exh. 7-F, p. 4).  However, the record does not include any significant psychiatric records from 2005.  On October 4, 2006, treating psychiatrist Stephen

1  Cummings, M.D., opined, ". . . he does not have a pure psychiatric illness. . . .  the patient abuses methamphetamine and alcohol by his own free admission" (Exh. 9-F, pp. 26-28).
2

3  The record includes a series of drug-related emergency room presentations in 2007 (Exh. 9-F, pp. 14-16).  For example, on October 16, 2007, the claimant refused a physical examination and all vital sign testing (Exh. 9-F, pp. 1-2).
4

5

6  On October 30, 2007, the claimant entered an at least 6 month inpatient program at Eagle Recovery.  According to Deborah Couvillion, a clinician or administrator at that facility, the claimant's prognosis for medical improvement depended upon his approval for SSI, presumably to continue to pay for that treatment and housing.  Ms. Couvillion suggested that a full year duration would be necessary to meet the goals of being able to function in society without dependence upon drugs and alcohol (Exh. 12-F, p. 1).
7

8

9

10  In a consultative psychological evaluation dated February 9, 2008, the claimant informed Ubaldo F. Sanchez, M.D., that he was depressed that he was unable to work, contending that he was being compliant with his prescriptions for seroquel, topamax, and depakote, and also taking ibuprofen for right shoulder pain.  The claimant further reported that with the exception of only a single episode of relapse over 3 months ago, he had been "clean and sober" for 1 1/2 years.  Dr. Sanchez observed that the claimant was of average intelligence on testing, and diagnosed "bipolar disorder (and provisionally) rule-out mood disorder, not otherwise specified, (and) polysubstance abuse" with a "guarded" prognosis (Exh. 10-F).
11

12

13

14

15

16  The medical expert, a board certified specialist in the field of psychiatry, testified that according to the record, the claimant had a severe mood disorder, not otherwise specified, and a personality disorder, not otherwise specified, which in combination would have equaled Listings 12.04 and 12.06.  However, the medical expert further opined that the claimant has also had severe, chronic addiction to methamphetamine, alcohol, and marijuana that according to the record would have definitely been material to the findings of "disability" until he entered prolonged residential treatment on October 30, 2007.
17

18

19

20

21  After giving careful consideration to all the documentary evidence, the undersigned Administrative Law Judge has concluded that the claimant has had impairments that would in combination equal the criterial of Sections 12.04 and 12.06 of the impairments listed [in the regulations]; but also, that prior to October 30, 2007, his drug and alcohol dependence/abuse would have been a contributing factor material to the finding of "disability."
22

23

24

25  The undersigned primarily basis this determination upon the medical opinions of the testifying medical expert during the hearing, as well as in considering of the totality of medical evidence and restrictive medical
26

1    opinions in the record.

2    The claimant insists that he has remained almost entirely "clean and sober"
     since his October 30, 2007, residential treatment admission.  On February
3    9, 2008, consultative psychologist Dr. Sanchez still gave the claimant a
     GAF score of only '50' with findings of a decline of memory skills on
4    WMS-III.  Dr. Sanchez further opined that the claimant could not tolerate
     the pressures of a normal working environment and that he needs to
5    continue medication and treatment (Exh. 10-F).  The undersigned has
     considered the medical opinions of the non-examining State Agency
6    evaluators . . . but in view of the significantly more restrictive and severe
     medical opinions subsequently received from the testifying medical expert
7    and psychiatric specialist during the hearing, along with corroborative
     reports of his sobriety from the Eagle Recovery Program and Transition
8    Home (Exh. 12-F), they are no longer found to be consistent with the
     overall medical evidence – at least as and after October 30, 2007, the date
9    he entered that prolonged inpatient program.  Therefore, the undersigned
     has accorded the State Agency evaluator opinions less weight as of
10   October 30, 2007, and thereafter. . . .

11                        * * *

12   As testified by the medical expert and detailed above, prior to October 30,
     2007, there is no documented period of extended sobriety for the claimant
13   in the record.  Therefore, to the extent that the claimant contends that prior
     to October 30, 2007, even if he had been fully medically compliant and
14   abstinent to illegal drugs and alcohol, he still would have been unable to
     perform even simple repetitive tasks, the undersigned finds these
15   contentions to be less than fully credible when compared to the record as a
     whole. . . .  Thus a finding of "not disabled" would be reached for all
16   periods prior to October 30, 2007. . . .

17   In his first argument, plaintiff contends that the ALJ misapplied the legal

18   standards relating to drugs and alcohol abuse.  Plaintiff argues:

19          Here, the ALJ found that Mr. Suitt was disabled by his mental
     impairments throughout the entire relevant period (Tr. 28).  However, the
20   ALJ found that drugs and alcohol were a contributing factor material to
     Mr. Suitt's disability prior to October 30, 2007, and denied any benefits
21   prior to that date (Tr. 28, 32-33).  The ALJ then found that Mr. Suitt was
     still disabled by his mental impairments as of October 30, 2007, the date
22   that Mr. Suitt entered the Eagle Recovery Program and became clean and
     sober (Tr. 28, 32-33).  The ALJ awarded Mr. Suitt SSI benefits as of
23   October 30, 2007 (Tr. 28, 32-33). . . .
            The ALJ erred as a matter of law when he found that drugs and
24   alcohol were a contributing factor material to the finding of disability
     because Mr. Suitt continued to be disabled by his mental impairments even
25   after he became clean and sober.  The regulations and controlling case law
     clearly states that the SSA will find that "drug addiction or alcoholism is
26   not a contributing factor material to the determination of disability" if a

                                    12

1    claimant is disabled independent of drug addiction or alcoholism.   The
     ALJ's "materiality" determination was a clear error of law.  For this reason
2    alone, the Court should remand this case to the SSA for the payment of
     [benefits] dating back to January 1, 1999, the date Mr. Suitt claimed he
3    became disabled.

4          The court disagrees with plaintiff that the ALJ's legal analysis is flawed.

5    Plaintiff's argument flows from the ALJ's finding that, after October 30, 2007, he was disabled

6    by mental impairments which were not related directly to drug and/or alcohol abuse.  Plaintiff

7    appears to conclude that, if he had a disabling mental impairment independent of drug/alcohol

8    use after October 30, 2007, he must have also had the same impairment before that date.  While

9    plaintiff is correct that the existence of a disabling impairment after October 30, 2007, may

10   suggest that such an impairment existed before that date, such is not necessarily the situation in

11   all cases.  It is the plaintiff's obligation to present evidence that, during extended periods of

12   sobriety occurring before October 30, 2007, plaintiff still had a disabling mental impairment.

13   The ALJ concluded that no such evidence was presented and, based on this finding, properly

14   concluded that plaintiff had not met his burden of proof.

15         In his second argument, plaintiff asserts that, even if the ALJ applied the correct

16   legal standards, substantial evidence of record does not support the ALJ's ultimate disability

17   finding with respect to drugs and alcohol use.  Specifically, plaintiff argues: (1) the ALJ

18   improperly relied on Dr. Dusay's hearing testimony; and (2) drug/alcohol use is not a material

19   factor because plaintiff's mental impairment predates his drug/alcohol use.  The court rejects any

20   argument that the evidence does not support the ALJ's materiality conclusion for the period prior

21   to October 30, 2007.

22         At the outset, the court notes that there is evidence in the record that plaintiff

23   actually worked in the construction industry prior to October 30, 2007, but after the alleged

24   January 1999 onset date.  In October 2006, plaintiff reported upon admission to the hospital that

25   he had "recently" lost his job due to methamphetamine use.  In January 2008, plaintiff told Dr.

26   Ubaldo that he last worked two to three years ago, consistent with his report in October 2006 that

1    he had "recently" lost his job.  This evidence indicates that plaintiff worked sometime in 2006.  If
2    plaintiff was able to work in 2006, it stands to reason that his mental impairment was not
3    disabling at that time.

4              Next, contrary to plaintiff's assertion, the evidence does not establish any
5    extended periods of sobriety between the alleged onset date of January 1999 and October 30,
6    2007.[3]  While plaintiff alleges an 11-month period of sobriety in 1999, there is no objective
7    evidence to support this contention.  Plaintiff merely relies on his own subjective report to Dr.
8    Cheema in November 1999.  The ALJ correctly concluded that plaintiff's contention was less
9    than credible in light of the weight of all the evidence.  In July 1997, hospital notes indicate that
10   plaintiff's "drug behavior dates back at least one decade and has been unremitting."  In April
11   1998, plaintiff's toxicology screen showed positive results for illegal drugs.  The evidence also
12   indicates that, between November 2002 and October 2007, plaintiff consistently tested positive
13   for methamphetamine and/or marijuana.  The vast majority of the diagnoses offered during this
14   period were directly related to drug use.  In October 2006, a doctor opined that plaintiff did not
15   have any "pure" psychological problem independent of drug and/or alcohol abuse.

16             The evidence indicating "unremitting" drug use since 1987 (i.e., a decade prior to
17   July 1997) as well as consistent positive drug tests between 2002 and 2007 undermine plaintiff's
18   statement that he was sober for 11 months in 1999.  Moreover, the court finds that the ALJ was
19   correct in stating that plaintiff has not provided significant medical records for 2001 or 2002.[4]
20   Plaintiff has simply failed to carry his burden of showing that he was sober for any extended
21   period of time let alone showing that, during such time of sobriety, he still had a disabling mental
22   impairment.

23   _____

24        [3]     Defendant is correct in noting that evidence pre-dating January 31, 2000, is not
     material as the agency previously determined that plaintiff was not disabled prior to this date and
25   plaintiff did not challenge the decision which is entitled to administrative res judicata.

26        [4]     Plaintiff's own summary of the evidence skips from Dr. Cheema's November
     1999 report to a hospitalization in November 2002.

1    Finally, the court finds no error with respect to the ALJ's consideration of Dr.

2  Dusay's testimony.  As the ALJ noted, Dr. Dusay stated that he could find no periods of extended

3  sobriety prior to October 2007.  In fact, Dr. Dusay stated that he could not be sure that

4  polysubstance abuse was not the cause of plaintiff's problems.

5

6                                        **V.  CONCLUSION**

7    Based on the foregoing, the court concludes that the Commissioner's final

8  decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

9  ORDERED that:

10            1.    Plaintiff's motion for summary judgment (Doc. 18) is denied;

11            2.    Defendant's cross-motion for summary judgment (Doc. 19) is granted; and

12            3.    The Clerk of the Court is directed to enter judgment and close this file.

13

14

15  DATED:  November 22, 2010

16

17                                        **CRAIG M. KELLISON**
                                          UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24

25

26